**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 24-1305
_____

FRANK GIORDANO; DANIEL M. DILELLA,
Appellants

v.

ANDREWS HOHNS; NOAH GRIFFIN; JAMES
SWANSON; JANE AND JOHN DOES (1-10); UNITED
STATES OF AMERICA

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2:23-cv-01614)
District Judge: Honorable Nitza I. Quiñones Alejandro
_____

Argued on November 8, 2024

Before: KRAUSE, BIBAS, and SCIRICA, *Circuit Judges*

(Opinion filed: November 18, 2025)

George A. Bochetto
Kiersty DeGroote **[ARGUED]**
David P. Heim **[ARGUED]**
Bochetto & Lentz
1524 Locust Street
Philadelphia, PA 19102

*Counsel for Appellants*

Landon Y. Jones, III
Rebecca S. Melley **[ARGUED]**
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106

*Counsel for Appellees*

_____

OPINION OF THE COURT
_____

KRAUSE, *Circuit Judge*.

Given the wide range of federally affiliated programs in the United States, it is not always clear who counts as a federal employee, but that status can make a world of difference when a putative employee-defendant is sued. In general, when a federal employee is sued in state court for on-the-job tortious conduct, the Westfall Act, 28 U.S.C. §§ 2671, 2674, 2679, in conjunction with the Federal Tort Claims Act, *id.* § 2671 *et seq.* (FTCA), authorizes the Attorney General to substitute the United States for the individual defendant, to remove the case

to federal court, and to have the claim dismissed on sovereign-immunity grounds. But that shield from individual liability is only available if the defendant qualifies as an "[e]mployee of the government," *id.* § 2671, and the Attorney General certifies that the employee "was acting within the scope of his office or employment," *id.* § 2679(d)(1).

Here, Appellees Andrew Hohns, Noah Griffin, and James Swanson (the Defendants) are three members of the United States Semiquincentennial Commission, who made statements critical of the Commission's then Chairman and Executive Director, Appellants Daniel DiLella and Frank Giordano. When DiLella and Giordano were eventually asked to step down from those roles, they brought a tort action against the Defendants in the Philadelphia Court of Common Pleas. But their suit was short-lived. Invoking the Westfall Act, the Attorney General certified that the Defendants' statements were made "within the scope of [their] office or employment," *id.* § 2679(d)(1), removed the case to federal court, and successfully moved for dismissal on the basis of sovereign immunity.

Giordano and DiLella argue that was error because the Defendants do not qualify as "[e]mployee[s] of the government," *id.* § 2671, and, even if they did, their statements were not made in the course of their employment. Perceiving no error, we will affirm.

## I. **Background**

In 2026, this country is poised to celebrate its 250th anniversary. To prepare for that momentous occasion, Congress passed the United States Semiquincentennial Commission Act, Pub. L. No. 114-196, 130 Stat. 685 (2016)

(the Commission Act), which created the United States Semiquincentennial Commission—a bipartisan entity tasked with "planning, encouraging, developing, and coordinating the Nation's 250-year anniversary celebrations," J.A. 35; *see* Commission Act § 4(a). The Commission "serve[s] as the point of contact of the Federal Government for all State, local, international, and private sector initiatives regarding the Semiquincentennial of the founding of the United States." *Id.* § 5(e); *see also id.* § 6.

The Commission consists of 24 voting members—four Senators, four House members, and sixteen private citizens appointed by congressional leadership—as well as several nonvoting members, including the Secretary of the Interior, the Secretary of State, the Attorney General, the Secretary of Defense, the Secretary of Education, the Librarian of Congress, the Secretary of the Smithsonian Institution, and the Archivist of the United States. *Id.* § 4(b). Congress later added the National Endowment for the Arts chair, the National Endowment for the Humanities chair, the Institute of Museum and Library Services director, and the Chief Justice (or his substitute) to the list of non-voting members. United States Semiquincentennial Commission Amendments Act, Pub. L. No. 116-282, § 2(a), 134 Stat. 3386 (2020) (the Commission Amendments Act).

As for the Commission's governing structure, the Chairperson is selected from among the private-citizen members by the President of the United States and is himself authorized to hire an Executive Director. Commission Act §§ 4(b), 8(c). In addition, the Commission Act empowers the Secretary of the Interior to select a nonprofit to serve as "administrative secretariat"—the entity responsible for

performing the Commission's "financial and administrative services." *Id.* §§ 5(e), 9(b).

That background sets the scene for the entrance of the parties to this case. When the Commission was founded, DiLella was appointed a private-citizen member and named Chairperson, originally by President Trump and later by President Biden, who reappointed him. DiLella, in turn, hired Giordano as Executive Director. *See* Commission Act § 8(c). Hohns, Griffin, and Swanson were also among the appointed private-citizen members. In addition to serving as a Commissioner, Hohns was the founder of a nonprofit, USA250, that he championed for the administrative secretariat role. When another entity was selected, Hohns allegedly laid blame at the feet of DiLella and Giordano, and conflict— culminating in the underlying suit here—swiftly ensued.

In January 2023, DiLella and Giordano filed a complaint against the Defendants for defamation, false light, tortious interference, and civil conspiracy in the Philadelphia Court of Common Pleas. As alleged in the complaint, Hohns, angered at being overlooked for a leadership role and at his nonprofit's unsuccessful bid for the administrative secretariat role, formed a "personal animus," J.A. 78, against DiLella and Giordano and began publicly accusing them of "mismanaging the Commission, wasting public funds, engaging in cronyism, violating the Commission's internal rules and by-laws, and breaching their fiduciary duties," J.A. 71. Griffin and Swanson then allegedly joined Hohns in a "malicious effort . . . to wrest leadership of the Commission from Plaintiffs," "engag[ing] in a campaign of libel, slander, and smearing." *Id.* As part of that campaign, Hohns allegedly "participated in penning a letter" on the letterhead of then Congressman Robert Brady that

questioned DiLella's conduct as Chairperson, J.A. 78-79, and then used that letter to denigrate DiLella's leadership at the first Commission meeting, J.A. 79. The Defendants also allegedly "hijacked a September 2021 Commission meeting by interrupting DiLella," to complain about mismanagement of the Commission, J.A. 80, and then contacted the media and "influential elected officials within Congress . . . making the same or similar false and defamatory claims," J.A. 81-82.

According to the complaint, this defamation damaged DiLella's and Giordano's reputations, undermined their authority, caused them emotional distress, and eventually resulted in their removal from the leadership of the Commission. Even though a subsequent internal investigation revealed there was "no evidence of the alleged wrongdoing" by Commission leadership, the allegedly defamatory statements also had severe consequences for DiLella and Giordano in their personal and professional lives outside of the Commission. J.A. 82.

Soon after the complaint was filed in state court, the Attorney General intervened on behalf of the Defendants, removed the case to the Eastern District of Pennsylvania under the Westfall Act, certified that the Defendants were acting within the scope of their federal employment under 28 U.S.C. § 2679(d)(2), and substituted the United States as defendant in their place. Over the objections of DiLella and Giordano, the District Court determined that substitution was proper, decided discovery was unnecessary to confirm that conclusion, and then granted the Government's motion to dismiss.

DiLella and Giordano filed this timely appeal.

## II.    Jurisdiction and Standard of Review

The District Court had jurisdiction to accept the certification and dismiss the case under 28 U.S.C. § 2679 and 28 U.S.C. § 1346(b)(1).  We have jurisdiction under 28 U.S.C. § 1291.  This appeal presents two issues: (1) whether the District Court erred by accepting the certification and substituting the United States as defendant, and (2) whether the District Court should have permitted discovery before dismissing the case.  We review the dismissal *de novo*.  *See Aliota v. Graham*, 984 F.2d 1350, 1358 (3d Cir. 1993).  We also conduct plenary review of the District Court's determination that the Defendants were federal employees "acting within the scope of employment," *id.*, but we review its "decision to deny jurisdictional discovery . . . for abuse of discretion," *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 455 (3d Cir. 2003).

## III.    Discussion

The federal government serves the nation not only through the well-known institutions that comprise the three branches, but also through a wide range of federally organized or funded entities, as well as local agencies and contractors.  As a result, determining who qualifies as an "[e]mployee of the government" can sometimes prove challenging.  28 U.S.C. § 2671.  This case requires us to take up that challenge in the context of the FTCA and Westfall Act.  To determine whether those statutes cover the private-citizen Commissioners of the Semiquincentennial Commission, we consider below (A) the history and function of the Westfall Act, (B) the hallmarks of a federal agency under the FTCA and Westfall Act, (C) whether the Commission possesses those hallmarks, (D) whether the Defendants qualify as "[e]mployee[s] of the

7

government," *id.*, and (E) if they do, whether their statements were made within the scope of their employment.

### A. History and Function of the Westfall Act

As a sovereign, the United States generally enjoys blanket immunity from suit unless it chooses to waive that immunity. *Millbrook v. United States*, 569 U.S. 50, 52 (2013). Congress took that step in the FTCA, which, as a "limited waiver of sovereign immunity," opened the federal government to liability "to the same extent as a private party for certain torts of federal employees acting within the scope of their employment." *United States v. Orleans*, 425 U.S. 807, 813 (1976). But that waiver carried an unintended consequence: As interpreted by the Supreme Court in *Westfall v. Erwin*, 484 U.S. 292 (1988), the FTCA subjected federal employees to *personal* tort liability for their public service. Congress disagreed with that reading, and in 1988, passed the Westfall Act, which immunized federal employees from work-related tort liability and authorized the federal government to intervene in such cases. *See* 28 U.S.C. § 2679(b)(1)-(2); *Osborn v. Haley*, 549 U.S. 225, 229 (2007). The Westfall Act thus incorporated the common law concept of *respondeat superior*, which imputes liability to employers for their employees' torts, as here, against the federal government. *See Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 420 (1995); *Carroll v. Trump*, 49 F.4th 759, 765 (2d Cir. 2022).

Since that time, the FTCA and Westfall Act have worked in tandem to provide the "exclusive" remedy in any "civil action or proceeding for money damages," 28 U.S.C. § 2679(b)(1), stemming from "torts committed by federal employees acting within the scope of their employment," *Levin*

8

*v. United States*, 568 U.S. 503, 509 (2013) (citing 28 U.S.C. § 2679(b)(1)).    Once a suit is brought against a federal employee, the Attorney General can certify "that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose" and substitute the United States for the individual defendant.    28 U.S.C. § 2679(d)(1)-(2).[1]    Thus, federal employees are shielded from personal tort liability for conduct on the job, and the federal government steps in to protect them from the burden of defending a lawsuit. *See Osborn*, 549 U.S. at 248, 252.  If that lawsuit is pending in state court, it is then removed to federal district court, with the United States substituting for its employee.  28 U.S.C. § 2679(d)(2).

That is not to say the Attorney General's decision to certify under the Westfall Act is wholly unreviewable.  While

---

[1] The first subsection of § 2679(d) addresses certification and substitution in a case originally filed in federal district court, while the second subsection addresses removal, as well as certification and substitution, in a case originally filed in state court.  The language regarding certification and substitution in each subsection is almost identical:  "Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim . . . shall be deemed [to be] an action against the United States . . . and the United States shall be substituted as the party defendant."  28 U.S.C. § 2679(d)(1)-(2).  The subsection on removal also provides that the "certification of the Attorney General shall conclusively establish scope of office or employment for purposes of removal." *Id.* § 2679(d)(2).

the Attorney General's certification "conclusively establish[es] scope of office or employment for purposes of *removal*," *id.* (emphasis added), it does not definitively resolve the issue of substitution, *see Osborn*, 549 U.S. at 252. In fact, "[s]ection 2679(d)(2) does not preclude a district court from resubstituting the federal official as defendant . . . if the court determines, postremoval, that the Attorney General's scope-of-employment certification was incorrect." *Id.* at 242. Certification merely provides "*prima facie* evidence that the employee's challenged conduct was within the scope of employment." *Schrob v. Catterson*, 967 F.2d 929, 935 (3d Cir. 1992) (collecting cases). So, the district court is ultimately tasked with confirming that substitution is appropriate. *See Osborn*, 549 U.S. at 252.

In doing so, the district court must assure itself (1) that the individual defendant is an "[e]mployee of the government" as defined by the FTCA, *see* 28 U.S.C. § 2671,[2] and (2) that the alleged tort occurred within the scope of that defendant's employment—which is a question of state law, *CNA v. United States*, 535 F.3d 132, 138 (3d Cir. 2008). The district court can also authorize limited discovery into those issues if necessary, but it is not required to do so when the material facts are not disputed. *See infra* Section III.E.

If a defendant is not a covered employee or was acting "beyond the scope of his employment," the suit proceeds against the original, individual defendant under traditional tort principles. *Osborn*, 549 U.S. at 231. But, if the court is

---

[2] The Westfall Act incorporates the FTCA's definition of government employee. *See Carroll v. Trump*, 49 F.4th 759, 767 (2d Cir. 2022).

satisfied that the requirements for substitution are met, the case instead proceeds against the United States, subject to the FTCA's waiver of sovereign immunity. Of course, there are exclusions from that waiver that "preclude[] recovery against the Government," *United States v. Smith*, 499 U.S. 160, 165 (1991), and if one of those exclusions covers the particular tort at issue, the district court must dismiss the suit, leaving the plaintiff "without a tort action against any party," *Lamagno*, 515 U.S. at 420; *see also Smith*, 499 U.S. at 165.

As relevant here, the FTCA expressly excludes defamation claims from the federal government's immunity waiver,[3] which is why—notwithstanding the FTCA's waiver of sovereign immunity for many other torts—the Government's substitution doomed DiLella and Giordano's case in the District Court. *See* 28 U.S.C. § 2680(h). But DiLella and Giordano argue that substitution was improper in the first place because the Defendants were not (1) "[e]mployee[s] of the government," *id.* § 2671, who (2) were acting within the scope of their employment. We address these arguments in turn.

### B.    The Hallmarks of a Federal Agency Under the FTCA and Westfall Act

Despite Congress's desire to protect federal employees, the FTCA and Westfall Act were "never intended" to apply to

---

[3] The FTCA does not waive sovereign immunity as to claims "arising out of . . . libel, slander, misrepresentation, deceit, or interference with contract rights." 28 U.S.C. § 2680(h); *see also Brumfield v Sanders*, 232 F.3d 376, 383 (3d Cir. 2000) ("[T]he defamation exception to the FTCA [can]not be avoided by 'attaching a different label to the tort.'" (citation omitted)).

employees of "*all* federally funded programs." *Orleans*, 425 U.S. at 813 (emphasis added). Instead, these statutes apply only to "[e]mployee[s] of the government," as defined by 28 U.S.C. § 2671. Of the several categories of federal workers included in that definition, only two potentially cover members of the Commission: "officers or employees of any federal agency" and "persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation."[4] 28 U.S.C. § 2671. Either definition requires the existence of a "federal agency." So, before we can decide whether the Defendants are covered by the Westfall Act, we must determine if their employer, the Commission, is a federal agency. We thus consider (1) the statutory definition of a federal agency and (2) caselaw interpreting that definition, before (3) distilling from that case law the indicia of a federal agency under § 2671.

### 1.    *The Statutory Definition*

As with any question of statutory interpretation, we start with the text. *See Pellegrino v. U.S. Transp. Sec. Admin., Div. of Dep't of Homeland Sec.*, 937 F.3d 164, 170 (3d Cir. 2019) (en banc). The Westfall Act states that "federal agency":

---

[4] The full definition "includes (1) officers or employees of any federal agency, members of the military or naval forces of the United States, members of the National Guard while engaged in training or duty . . . and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation, and (2) any officer or employee of a Federal public defender organization . . . ." 28 U.S.C. § 2671.

12

> includes the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, but does not include any contractor with the United States.

28 U.S.C. § 2671.[5]  As our sister circuits have also observed, Congress's use of the word "includes" indicates that § 2671's enumerated list is illustrative, not exhaustive.[6]  *See Carroll*, 49 F.4th at 768-69; *Talignani v. United States*, 26 F.4th 379, 382 (7th Cir. 2022); *United States v. LePatourel*, 571 F.2d 405, 408 (8th Cir. 1978).  So, what follows "includes" are examples of entities fitting the category of a "federal agency," but after that

---

[5] While this definition is specific to the FTCA, Congress defined "agency" more generally elsewhere in Title 28 to "include[] any department, independent establishment, commission, administration, authority, board or bureau of the United States or any corporation in which the United States has a proprietary interest, unless the context shows that such term was intended to be used in a more limited sense."  28 U.S.C. § 451.  The lists in both provisions indicate that many types of organizations may qualify as agencies.

[6] Notably, the Supreme Court recognized the significance of "includes" as illustrative shortly before Congress enacted the FTCA in 1946, *see Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941); *Groman v. Comm'r of Internal Revenue*, 302 U.S. 82, 86 (1937), making it "particularly probative" of § 2671's original meaning.  *See Carroll*, 49 F.4th at 769 n.7.

non-exhaustive list comes an example of an entity outside that category, namely, "any contractor." 28 U.S.C. § 2671.

On which side of that line is the Commission? It obviously is not an "executive department[]," a "judicial or legislative branch[]," or a "military department[]." *Id.* Nor does any party suggest it is a corporation. So is it an "independent establishment[] of the United States," *id.*, or— because § 2671 is illustrative, not exhaustive—something comparable?

By its terms, an "independent establishment[] of the United States" is an institution,[7] separate and apart from the three branches of government or the military,[8] yet still "of the

---

[7] *See Establishment*, Black's Law Dictionary (3d ed. 1933) ("Institution, place where conducted and equipment; industrial plant and appurtenances; place of business and fixtures; residence with grounds, furniture, equipage, etc.").

[8] *See Independent*, Black's Law Dictionary (3d ed. 1933) ("Not dependent; not subject to control, restriction, modification, or limitation from a given outside source."). Though executive agencies have often been described as "independent" in that their leadership historically has been insulated from executive removal, *see, e.g.*, *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 204-06 (2020); *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 483 (2010). *But cf. Trump v. Slaughter*, No. 25-332, 2025 WL 2692050 (2025) (granting certiorari to decide whether *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), should be overruled); *Trump v. Wilcox*, 145 S. Ct. 1415, 1420 (2025) (Kagan, J., dissenting) ("[T]he majority all but declares *Humphrey's* itself the

United States"—*i.e.*, belonging to the federal government. *Cf. Of*, Black's Law Dictionary (3d ed. 1933) (indicating "origin, source, descent, and the like" or "[a]ssociated with or connected with"). Consistent with this understanding, Congress has, from time to time, used the term "independent establishment" when creating a discrete government entity for a specific purpose, like the National Center for Productivity and Quality of Working Life, *see* 15 U.S.C. § 2411, or the Armed Forces Retirement Home, *see* 24 U.S.C. § 411, that do not fall within an existing department.[9] But what are the distinctive features of such entities? How are they, or, for that matter, "corporations primarily acting as instrumentalities or agencies of the United States," 28 U.S.C. § 2671, distinguishable from state or local agencies that have federal funding and oversight, or from "contractor[s] with the United States" that are also independent of the other branches yet authorized to act on behalf of the federal government? We look to precedent for answers.

---

emergency."), we are unaware of any cases that designate such agencies "independent establishments" instead of "executive departments" for purposes of § 2671.

[9] *Cf.* 5 U.S.C. § 104 (defining "independent establishment" as "an establishment in the executive branch (other than the United States Postal Service or the Postal Regulatory Commission) which is not an Executive department, military department, Government corporation, or part thereof, or part of an independent establishment"); *Am. Foreign Serv. Ass'n v. Trump*, 768 F. Supp. 3d. 6, 12 (D.D.C. 2025) (observing that the "Foreign Affairs Reform and Restructuring Act . . . recognized USAID as an 'independent establishment' *outside* of [the State] Department" under 5 U.S.C. § 104).

### 2. *Case Law Distinguishing Federal Agencies*

Although the Supreme Court has not explicitly defined "federal agency" in the context of the FTCA and Westfall Act, a common theme emerges from its precedent attempting to draw lines between federal agencies and outside entities: The distinguishing feature of a federal agency for purposes of the FCTA and Westfall Act is the federal government's level of control over the organization. We briefly survey that case law to discern which aspects of federal control have carried most significance.

The Supreme Court first confronted this issue in *Maryland ex rel. Levin v. United States*, a case arising from our Circuit, which addressed whether National Guard members who were not on active duty qualified as federal employees for purposes of the FTCA. 381 U.S. 41, 46, 48, *amended by*, 382 U.S. 159 (1965). We had previously distinguished between Guardsmen who were activated into federal service and those who were not to determine whether the federal or state government exercised control over the individual. *Compare O'Toole v. United States*, 206 F.2d 912, 915 (3d Cir. 1953) (holding that a Guardsman on federal orders was a federal employee when there was "a direct chain of control and command from the President through the Guard's commanding general to the enlisted members"), *with Maryland ex rel. Levin v. United States*, 329 F.2d 722, 729 (3d Cir. 1964) (holding that a Guardsman, when not federally activated, "was an employee of the State of Maryland" because he was ultimately "subject to the supervision and control . . . of [Maryland's] Adjutant General"), *aff'd*, 381 U.S. 41 (1965), *amended by*, 382 U.S. 159 (1965).

The Supreme Court agreed with that distinction. *Maryland*, 381 U.S. at 52-53. The Court considered federal funding and regulatory requirements to be relevant, but not dispositive. *Id.* at 48. Despite the fact that the Guardsmen were paid from federal funds and followed federal requirements, the Court viewed intervening control by the state as the key determinative factor.[10] *Id.* Because the Department of Defense treated certain civilian personnel as state employees and the state exercised "supervision" over both military and civilian National Guard members, the Court held them to be "employee[s] of the State of Maryland," not the federal government. *Id.* at 46; *see also id.* at 53.

Later, in *Logue v. United States*, the Court examined the line between private contractors and federal agencies, observing that the FTCA's definition of the latter incorporates the traditional tort-law distinction between contractors and employees. 412 U.S. 521, 527-28 (1973). Looking to the traditional criterion of "authority" to control the contractor's "detailed physical performance," *id.*, the Court held that employees of a county jail contracted by the Federal Bureau of Prisons were not "employee[s] of the [g]overnment" for whom the United States was liable under the FTCA, *id.* at 526. Again, local operational control and oversight trumped federal funding and regulatory requirements: Even though the county was required to comply with Bureau of Prisons regulations, the BOP did not supervise the facility or employees. In short, the

---

[10] *Maryland ex rel. Levin v. United States*, 381 U.S. 41 (1965), *amended by*, 382 U.S. 159 (1965), predated an amendment to the FTCA that classified National Guard members as employees of the federal government. *See* 28 U.S.C. § 2671. That definition of employee has since expanded further.

facility was not a federal agency because "day-to-day operations of the contractor's facilities were to be in the hands of the contractor," not the federal government. *Id.* at 529.

In *United States v. Orleans*, the Court expanded *Logue*'s holding beyond the contractor exception, once again focusing on control as the key factor in distinguishing federal agencies from other entities.[11] Formation and purpose, as well as governance and operational control, took precedence over funding in *Orleans* when the Court was asked "whether a community action agency funded under the Economic Opportunity Act of 1964 is a federal instrumentality or agency" under the FTCA. 425 U.S. at 809.

Recognizing that the distinction between a contractor and an agency is informed by "well-established concepts of master and servant relationships" in common law, *id.* at 820; *see also id.* at 815 n.4, the Court once again held that the "critical element," *id.* at 814, was not whether the entity received federal funds or was subject to federal regulation, but "whether or not there was day-to-day [federal] control of a program," *id.* at 816 n.5; *see also id.* at 815. It observed that a community action agency was either a "State or political subdivision of a State . . . or a public or private nonprofit agency or organization which has been designated by a State or such a political subdivision," *id.* at 809 (alteration in original) (citation omitted), even if it was "created for the

---

[11] The Supreme Court has also imported the idea of day-to-day control in other areas, observing that "characterizing an entity as 'federal' for some purpose . . . require[s] a threshold showing of substantial federal supervision of the private activities." *Forsham v. Harris*, 445 U.S. 169, 180 n.11 (1980).

purpose of carrying out the community action programs contained in the Economic Opportunity Act of 1964," *id.* at 811.

And the Court noted that these entities were "to be administered by a *community* action board composed of *local* officials," while employees of the federal Office of Economic Opportunity were barred from serving on the board. *Id.* at 817 (emphasis in original). Considering these factors, the Court concluded that even though "the Federal Government suppl[ied] financial aid, advice, and oversight . . . to assure that federal funds not be diverted to unauthorized purposes," *id.* at 818, these entities were "not federal agencies or instrumentalities, nor [we]re their employees federal employees within the meaning of the Federal Tort Claims Act," *id.* at 819.

We, in turn, have applied these teachings in our own caselaw, treating federal control over an entity as the key inquiry. In *Gibson v. United States*, for example, we characterized *Orleans* and *Logue* as focusing on federal "operational control," and we determined that the United States could not be held vicariously liable under the FTCA for a federal contractor running a federal job corps center when it did not control the center's "day-to-day" operations. 567 F.2d 1237, 1240-42 & n.8 (3d Cir. 1977); *see also Norman v. United States*, 111 F.3d 356, 357 (3d Cir. 1997) (recognizing that federal control is the critical distinguishing factor between federal-agency employees and independent contractors). Our sister circuits have likewise relied on *Maryland*, *Logue*, *Orleans* and their progeny in distinguishing contractors and

other entities from agencies, based on the federal government's authority to exert control over an organization.[12]

Having determined that federal control is the distinguishing feature of a federal agency, we next consider the characteristics indicative of that control.

### 3.     Indicia of Federal Control

Despite clarifying that control is the key inquiry, our precedent does not delineate the characteristics that evince the requisite federal control.  Depending on the nature of the entity, control may look quite different.  On the one hand, looking for "day-to-day" control is, to some extent, a familiar inquiry when determining whether a seemingly private or local entity is a federal agency because, although many such organizations

---

[12] *See, e.g.*, *Kuntz v. Lamar Corp.*, 385 F.3d 1177, 1184-85 (9th Cir. 2004) (distinguishing an electrical cooperative from a federal agency); *Berkman v. United States*, 957 F.2d 108, 114 (4th Cir. 1992) (distinguishing a contractor working with the Federal Aviation Administration from an agency); *Mendrala v. Crown Mortg. Co.*, 955 F.2d 1132, 1135-38, 1142-43 (7th Cir. 1992) (concluding that the Federal Home Loan Mortgage Corporation was not a corporation "primarily acting as [an] instrumentalit[y] or agenc[y] of the United States"); *Lewis v. United States*, 680 F.2d 1239, 1240-41 (9th Cir. 1982) (distinguishing a Federal Reserve Bank from agencies); *Expeditions Unlimited Aquatic Enters., Inc. v. Smithsonian Inst.*, 566 F.2d 289, 296 & n.6 (D.C. Cir. 1977) (determining that the Smithsonian is a federal agency); *Pearl v. United States*, 230 F.2d 243, 245 (10th Cir. 1956) (looking to control to determine whether a corporation was "primarily acting as (an) instrumentality of the United States").

perform federal functions, "traditional agency principles" dictate that federal tort liability—and immunity—"depends upon the principal's ability to control the actions of his agent."[13] *Lewis v. United States*, 680 F.2d 1239, 1243 (9th Cir. 1982). On the other hand, "day-to-day" control is an awkward fit for entities such as Congress, the courts, and cabinet departments—all of which are clearly agencies under the FTCA's definition—because those organizations are part and parcel of the federal government, not a third party over which the federal government has reached out to exert control. But, of course, those entities, housed within the federal bureaucracy, are still subject to the government's control and corresponding FTCA liability. *See Vincent v. United States*, 513 F.2d 1296, 1297 (8th Cir. 1975) (recognizing a difference between entities that are not "separate and distinct from the United States" and those that federal control transforms into agencies under the FTCA).

So federal control is always the yardstick, but as control may manifest differently depending on the organization, courts consider a variety of factors. Some of our sister circuits have attempted to catalogue them. For example, drawing on

---

[13] For example, the community action agency addressed in *Orleans* was not a federal entity but instead a "State or political subdivision of a State . . . or a public or private nonprofit agency or organization." *United States v. Orleans*, 425 U.S. 807, 809 (1976) (alteration in original) (quoting 42 U.S.C. § 2790(a)). Federal grant funding and regulation were not enough to transform these local entities into federal agencies. Likewise, in *Logue*, *Maryland*, and *Gibson*, the entities in question were not federally controlled because there was some intervening level of supervision—either private or state.

*Maryland*, *Logue*, *Orleans*, and their progeny, the Seventh Circuit examines "(1) the federal government's ownership interest in the entity; (2) federal government control over the entity's activities; (3) the entity's structure; (4) government involvement in the entity's finances; and (5) the entity's function or mission." *Mendrala v. Crown Mortg. Co.*, 955 F.2d 1132, 1136 (7th Cir. 1992). The D.C. Circuit, in assessing whether the Smithsonian was an FTCA agency, observed that the "nature of its function as a national museum and center of scholarship, coupled with the substantial governmental role in funding and oversight" made that institution an "independent establishment[] of the United States" under the FTCA. *Expeditions Unlimited Aquatic Enters., Inc. v. Smithsonian Inst.*, 566 F.2d 289, 296 (D.C. Cir. 1977). And the Ninth Circuit likewise observed that, in addition to "the critical factor [of] the existence of federal government control over the 'detailed physical performance' and 'day to day operation'" of the organization, *Lewis*, 680 F.2d at 1240-41 (quoting *Orleans*, 425 U.S. at 814; *Logue*, 412 U.S. at 528), relevant factors include "whether the entity is an independent corporation, whether the government is involved in the entity's finances, and whether the mission of the entity furthers the policy of the United States," *id.* (citations omitted); *see also Pearl v. United States*, 230 F.2d 243, 245 (10th Cir. 1956) (considering federal ownership and financial oversight of a federally chartered corporation).

Although we have not previously articulated a specific test for federal control under the FTCA and Westfall Act, we have done so in analogous contexts. *See, e.g.*, *Staten v. Hous. Auth. of Pittsburgh*, 638 F.2d 599, 602-04 (3d Cir. 1980) (assessing whether a state housing authority was a federal agency for purposes of the Civil Rights Attorney's Fees

22

Awards Act of 1976). In particular, when evaluating which entities are entitled to Eleventh Amendment immunity, we perform a fact-intensive, individualized inquiry, asking three basic questions: (1) "whether the state treasury is legally responsible for an adverse judgment entered against the alleged arm of the State;" (2) "whether the entity is treated as an arm of the State under state case law and statutes;" and (3) "whether, based largely on the structure of its internal governance, the entity retains significant autonomy from state control." *Maliandi v. Montclair State Univ.*, 845 F.3d 77, 83 (3d Cir. 2016).

The first of these begs the question we are attempting to answer today—whether the federal government is on the hook for the judgment.[14]   But the second is more relevant,

---

[14] DiLella and Giordano point out that, unlike in some other enabling acts, Congress did not expressly state that the Commission is subject to the FTCA in the Commission Act, and would have us attach significance to this fact to the extent it incorporates the question of whether "the State has expressly immunized itself from the entity's liabilities." *See Maliandi v. Montclair State Univ.*, 845 F.3d 77, 90 (3d Cir. 2016). We decline to do so. After all, "[n]ot every silence is pregnant." *Mendrala*, 955 F.2d 1135 (alteration in original) (citation omitted); *see also id.* at 1135-36 (rejecting a similar argument that Congress's failure to expressly designate the FHLMC as a federal agency resolved the question of FTCA immunity and instead analyzing it under a five-part test). True, if Congress chooses to, it may expressly immunize a particular organization under the FTCA. *See, e.g.*, National Gambling Impact Study Commission Act, 18 U.S.C. § 1955 note, § 6(e);

23

encompassing "how state law treats the agency generally, whether the entity is separately incorporated, whether the agency can sue or be sued in its own right, . . . whether it is immune from state taxation[,] . . . the entity's authority to exercise the power of eminent domain, application of state administrative procedure and civil service laws to the entity, the entity's ability to enter contracts and make purchases on its own behalf, and whether the entity owns its own real estate." *Id.* at 91 (quoting *Fitchik v. N.J. Transit Rail Operations, Inc.*, 873 F.2d 655, 659 (3d Cir. 1989)). Each of these inquiries evinces the sovereign's control over and relationship with an

---

Commission on the Advancement of Women and Minorities in Science, Engineering, and Technology Development Act, 42 U.S.C. § 1885a note, § 5(i). But such an affirmation is not required, and Congress itself has attempted to foreclose this argument: In one of the very acts cited by DiLella and Giordano, Congress made explicit that its affirmation "shall not be construed to imply that any commission is not a 'Federal agency' or that any of the members or personnel of a commission is not an 'employee of the Government'" under the FTCA and Westfall Act. Pub. L. No. 105-30, § 2, 111 Stat. 248 (1997) (amending the National Gambling Impact Study Commission Act). Granted, Congress included that statement on construction in an amendment, which DiLella and Giordano take to mean that an otherwise silent law does not grant FTCA immunity. But it is well settled that Congress may amend in order to *clarify*, rather than *change*, a law. *See, e.g.*, *Brown v. Thompson*, 374 F.3d 253, 259 (4th Cir. 2004). Ultimately, DiLella and Giordano fail to explain why we must interpret a close-in-time amendment specifying the proper construction as a change, rather than a clarification, and apply that interpretation here.

organization. And the third factor is directly relevant to control: the "entity's governing structure and the oversight and control exerted by a State's governor and legislature." *Id.* at 96; *see also id.* at 96-97. These last two considerations can help guide our inquiry here.

Recognizing that in each instance, we are faced with a fact-intensive inquiry, we distill from the caselaw and our Eleventh Amendment test four guiding factors that evince federal control sufficient to identify a federal agency under the FTCA and Westfall Act: (1) formation and purpose, (2) governance, (3) financial oversight, and (4) operational control. Each factor should be considered, but—as the critical distinguishing line between federal agencies and other organizations is the federal government's power to exert day-to-day operational control—the fourth factor is the most weighty.

First, we consider whether Congress or the executive created an entity and housed it within the federal government, or whether the organization is local or private in nature. *See, e.g.*, *Orleans*, 425 U.S. at 816-17; *Mendrala*, 955 F.2d at 1138-39; *Lewis*, 680 F.2d at 1241; *Goddard v. D.C. Redevelopment Land Agency*, 287 F.2d 343, 345 (D.C. Cir. 1961). Does the enabling act direct states or municipalities to create organizations to form a specific function, *see Orleans*, 425 U.S. at 817, or does it act directly to form a federal creature? When an organization is formed by, housed under, or otherwise supervised by state, local, or private authority, it is less likely to be a federal agency without a clear showing of day-to-day federal control. *See, e.g.*, *id.* at 816 (observing that the community action agencies were "local, not . . . federal, enterprise[s]"); *Lewis*, 680 F.2d at 1241 (observing that

25

Federal Reserve Banks, "though heavily regulated, are locally controlled by their member banks"); *cf. Harris v. Boreham*, 233 F.2d 110, 115-16 (3d Cir. 1956) (holding that a municipal employee was not transformed into a federal employee, even though he was appointed by the Secretary of Interior and paid from federally appropriated funds). As part of this inquiry, courts can look to whether the entity was formed for a national or local purpose. *Compare Orleans*, 425 U.S. at 816 (local), *with Expeditions Unlimited*, 566 F.2d at 296 (national).[15]

Second, we ask who is leading the organization and how they are selected, employed, and, if applicable, removed. Specific inquiries here include whether some or all of the leadership consists of, or is appointed and removed by, the federal government. The more that an entity's board and executive suite are staffed or appointed by members of the federal government, the closer the relationship with the federal government, while state, local, or private leadership, or

---

[15] The Ninth Circuit has suggested that courts should consider "whether the mission of the entity furthers the policy of the United States," *Lewis*, 680 F.2d at 1240-41, but we view that inquiry as too broad. When Congress directs states to create local agencies through grants, such as in *Orleans*, this too, fulfills a federal policy interest. *See* 425 U.S. at 817. The purpose of considering an entity's mission is that it sheds light on whether the agency is functioning as a federal arm, *see Goddard v. D.C. Redevelopment Land Agency*, 287 F.2d 343, 345 (D.C. Cir. 1961), or whether a source of local control intervenes in exercising a local purpose, *see Orleans*, 425 U.S. at 816. Though it may be less likely that an organization formed for a local purpose will be a federal agency, it is not impossible. *See Goddard*, 287 F.2d at 345.

intercession by state, local, or private decision-makers, suggest the opposite.[16] Supervision and removability of leadership by the federal government is also indicative of federal control, as is the ultimate ownership of the entity.

Third, we look for specific federal financial oversight or involvement, as opposed to private, state, or local funding.

---

[16] *See Mendrala*, 955 F.2d at 1138 & n.7 (comparing the FDIC board, which "consists of the Comptroller of the Currency, the Director of the Office of Thrift Supervision and three members appointed by the President" with FHLMC's board, controlled by "private shareholders," with only a minority being presidentially appointed). *Compare Expeditions Unlimited*, 566 F.2d at 296 n.5 (observing that "[e]ight of the seventeen Regents of the [Smithsonian] acquire their positions by virtue of holding other high positions in the federal government" and the remainder "are appointed by joint resolution of Congress"), *with Orleans*, 425 U.S. at 817 ("[T]he Economic Opportunity Act provides that a community action agency is to be administered by a *community* action board composed of *local* officials, representatives of the poor and members of business, labor, and other groups in the community; no employee of the OEO can serve on the board." (emphasis in original) (citation omitted)); *compare Maliandi*, 845 F.3d at 97-98, *and Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 548-49 (3d Cir. 2007) (determining that the presence of state-government-appointed and removable board members indicated state control), *with Kovats v. Rutgers, The State Univ.*, 822 F.2d 1303, 1311 (3d Cir. 1987) (determining, for purposes of whether state sovereign immunity applied, that the presence of non-gubernatorially appointed board members indicated autonomy).

*Compare O'Toole*, 206 F.2d at 915, *with Logue*, 412 U.S. at 528-29, *and Maryland*, 329 F.2d at 729. At the same time, the mere existence of federal financial backing does not tip the scales. *See Orleans*, 425 U.S. at 816; *cf. Forsham*, 445 U.S. at 180 ("Grants of federal funds generally do not . . . serve to convert the acts of the recipient from private acts to governmental acts absent extensive, detailed, and virtually day-to-day supervision."). As the Supreme Court has observed, the federal government regulates a myriad of organizations through "gifts, grants, contracts, or loans," but "[i]t is inconceivable that Congress intended to have waiver of sovereign immunity follow congressional largesse." *Orleans*, 425 U.S. at 816; *see also Pearl*, 230 F.2d at 245 (noting that federal control over the Civil Air Patrol was "only such as is common to virtually all private corporations granted federal charters").

Rather, the relevant inquiry is whether the funding arrangement reveals a close relationship with the federal government. As demonstrated by *Orleans*, pairing funding with "advice[] and oversight only to assure that federal funds not be diverted to unauthorized purposes" is not enough to convert a contractor into an agency. 425 U.S. at 818; *cf. Forsham*, 445 U.S. at 180 n.11. Likewise, in *Staten v. Housing Authority of Pittsburgh*, in determining that a state housing authority was not a federal agency for purposes of the Civil Rights Attorney's Fees Awards Act of 1976, we considered the existence of federal funding, but noted that the state housing authority, not the federal government had "exclusive control over the federal grant funds," tipping the scales against finding it a federal agency. 638 F.2d at 604. On the sliding scale, the government's authority to oversee funds demonstrates more control, and direct appropriations from Congress evince a

28

particularly close tie to the federal government.  *See Goddard*, 287 F.2d at 345 (noting that appropriations supported a determination that the District of Columbia Redevelopment Land Agency was a federal agency under the FTCA); *Expeditions Unlimited*, 566 F.2d at 296 n.4 (noting that the Smithsonian was 75 percent funded by appropriations); *see also Mendrala*, 955 F.2d at 1138 (recognizing lack of appropriations); *Lewis*, 680 F.2d at 1242 (same).

In addition, close regulation and financial oversight may indicate government control.  Relevant considerations include annual audits by the Government Accountability Office (GAO) or a similar entity, *Pearl*, 230 F.2d 245, and requirements about who can prepare a budget, *Maliandi*, 845 F.3d at 97.  The dividing line is between these closely regulated and supervised entities, and those—like the Civil Air Patrol— whose level of regulation and supervision is "common to virtually all private corporations granted federal charters." *Pearl*, 230 F.2d at 245.

Fourth, and most importantly, courts consider evidence of day-to-day operational control.  Much like in the funding context, the fact that an organization is subject to regulation or must meet federal standards is not enough, because such requirements are common to many non-agencies.  *See Orleans*, 425 U.S. at 815; *Leone v. United States*, 910 F.2d 46, 50 (2d Cir. 1990); *Mendrala*, 955 F.2d at 1138.  Instead, we look at relationships with federal agencies and leadership, federal ownership,[17] federal reporting, tax status, application of administrative-procedure laws, and any other indicia of federal

---

[17] This factor is of particular importance when looking at a corporation.  *See Mendrala*, 955 F.2d at 1138.

supervision. *Mendrala*, 955 F.2d at 1138; *Pearl*, 230 F.2d at 245; *cf. Maliandi*, 845 F.3d at 91 (quoting *Fitchik*, 873 F.2d at 659). For example, the federal government may exert control over how an organization hires and governs employees by applying civil-service laws and employee programs that are not generally applicable, such as federal retirement programs, travel reimbursement, employment protections, ethics rules, or salary scales. *See Lewis*, 680 F.2d at 1241; *Maliandi*, 845 F.3d at 97. Likewise, requirements of adherence to procurement regulations—which may overlap somewhat with financial oversight—are also indicative of federal control. *See Maliandi*, 845 F.3d at 97. Even a factor as mundane as the number and location of meetings may be relevant. *Id.* Simply put, the ability to "determine the general policies that govern the operations" of an organization is day-to-day control. *Mendrala*, 955 F.2d at 1138 (citation omitted).

In contrast, the ability of non-federal authorities to intercede in decision-making demonstrates a weakened federal grasp, as does the power for an entity to act independently— such as owning its own property. *See Lewis*, 680 F.2d at 1241-42; *Maliandi*, 845 F.3d at 96-97. For example, the ability of a Federal Reserve Bank to set interest rates charged to member banks "without day to day direction" on such core policy matters also militated against status as a federal agency. *Lewis*, 680 F.2d at 1241. In essence, the organization's freedom to maneuver on its own when it comes to logistical and administrative matters is a key determinant of control.

In sum, an organization's federal-agency status will be clear in many cases, but to decide whether the FTCA and Westfall Act apply when that status is not clear, we look to the level of federal control, weighing the entity's formation and

purpose, governance, financial oversight, and day-to-day operational control. Having identified the relevant factors, we now apply them to the Commission.

### C.      The Commission Is a Federal Agency

The Commission fits neatly into the FTCA's definition of federal agency as an independent establishment, with each of the four federal-control factors favoring that status, though some more strongly than others.

#### 1.      *Formation and Purpose*

The Commission was created by Congress to act as a planning committee and liaison to the federal government for the Nation's 250th anniversary celebrations—a quintessentially federal purpose. Although it promotes, not just federal but also local, state, and international "activities," Congress designed the Commission to have national scope and to coordinate among federal and non-federal entities alike. Commission Act §§ 2(b), 4(a), 5(a), (e). Congress contrasted the Commission's task of "prepar[ing] an overall program" with "plans and programs developed by State, local, and private groups," and named the Commission as the "point of contact of the Federal Government for all State, local, international, and private sector initiatives." *Id.* § 5(a), (b), (e). This national coordination enterprise reflects a federal, rather than local, undertaking. *See Orleans*, 425 U.S. at 816; *see also Expeditions Unlimited*, 566 F.2d at 296. Unlike the community action agencies in *Orleans*, there is no state or local control whatsoever. *See* 425 U.S. at 809, 811.

The Commission is not housed within any existing federal agency, but exists as a freestanding organization,

31

befitting an "independent establishment[]" under the FTCA. 28 U.S.C. § 2671. Tellingly, when discussing coordination with federal agencies and use of the postal service,[18] the Act refers to "*other* federal agencies" and "*other* agencies of the Federal Government," further indicating that Congress intended to set up the Commission as a federal entity. *Id.* §§ 6(b), 7(c) (emphasis added).

Despite these indicia of federal purpose, DiLella and Giordano attempt to draw a distinction between an entity with a fixed lifespan like the Commission and a permanent entity, such as the Smithsonian. But the D.C. Circuit in *Expeditions Unlimited* did not remark on the Smithsonian's permanence when it determined that the FTCA applied. *See generally* 566 F.2d 289. Moreover, the Commission's recommended activities, which include the "development of . . . museums," Commission Act § 5(c)(2)(D), and its coordinating role in the "encouragement . . . of scholarly works," *id.* § 6(b)(3)(A) are quite similar to the Smithsonian's "function as a national museum and center of scholarship," *Expeditions Unlimited*, 566 F.2d at 296. So we see no basis to conclude that the Commission's temporary nature meaningfully distinguishes it from the Smithsonian, or diminishes its national formation and purpose.

In short, this factor strongly favors the Commission's status as a federal agency.

---

[18] The Commission is authorized to use the "United States mails in the same manner and under the same conditions as other agencies of the Federal Government." Commission Act § 7(c).

*2.    Governance*

The Commission's leadership structure also supports that conclusion. It is made up of twenty-four voting members—nearly half of whom are federal officials, and high-ranking officials at that. They include four Senators, four members of the House of Representatives, sixteen private-citizen members, and twelve nonvoting ex officio members—the Secretary of the Interior, the Secretary of State, the Attorney General, the Secretary of Defense, the Secretary of Education, the Librarian of Congress, the Secretary of the Smithsonian Institution, the Archivist of the United States, the National Endowment for the Arts chair, the National Endowment for the Humanities chair, the Institute of Museum and Library Services director, and the Chief Justice (or his substitute). Commission Act § 4(b); *see also* Commission Amendments Act § 2(a)(1) (altering the Commission's membership). That composition signals that the federal government is steering the ship.

Even the private-citizen members have the imprimatur of the federal government, as they are appointed by congressional leadership and the chairperson is selected from that pool by the President. *See* Commission Act § 4(b)(3). True, the private-citizen Commissioners are insulated from traditional federal oversight to the extent they are removable only by the Commission—rather than an outside federal authority. Commission Amendments Act § 2(a). Even then, however, Congress controls how the Commission may terminate a Commissioner—an internal Commission vote—and requires "notice and approval of the relevant appointing authority," *i.e.*, the particular member of Congress who appointed the Commissioner. *Id.*

DiLella and Giordano also assert a difference between the Smithsonian and the Commission in terms of governance, but their argument actually confirms why the governance factor favors the Commission's status as a federal agency. They point out that "there is no comparison," Reply Br. 3, between the two entities because "[e]ight of the seventeen Regents of the [Smithsonian] acquire their positions by virtue of holding other high positions in the federal government," *Expeditions Unlimited*, 566 F.2d at 296 n.5.  Meanwhile, eight of the twenty-four members of the Commission are members of Congress, the sixteen private-citizen members are all appointed by congressional leaders, and twelve non-voting members are high-ranking federal officials.  Commission Act § 4(b); Commission Amendments Act § 2.  So, in fact, there is little daylight between the Smithsonian—in DiLella and Giordano's view, a federal agency—and the Commission when it comes to the governance factor.

Because the Commission is comprised entirely of federal officials or individuals appointed by federal officials, this factor also bolsters the case for federal control.

### 3.    *Financial Oversight*

Because Congress both provides significant funding to the Commission and oversees its spending through reporting requirements, this factor, too, supports federal-agency status.

As for funding, although the Commission is authorized to raise its own money, Commission Act §§ 7(e), 9, it has overwhelmingly relied on Congress rather than grants or contracts, receiving almost $50 million in direct congressional

appropriations,[19] *see* Commission Amendments Act § 2(d), (f) (authorizing appropriations).  Those direct appropriations, funneled into the coffers of the Commission, are a strong indication of federal control.  *Compare Goddard*, 287 F.2d at 345 (placing substantial weight on the fact that "the Agency receives direct appropriations from Congress"), *and Expeditions Unlimited*, 566 F.2d at 296 n.4 ("Approximately 75% of the Institution's operating funds come from federal appropriations."), *with Mendrala*, 955 F.2d at 1138 ("[T]he FHLMC receives no appropriations from Congress."), *and Lewis*, 680 F.2d at 1242 (similar).  Thus, in contrast to *Staten*, where the federal government provided funding but the state housing authority had "exclusive control over the federal grant funds," here, Congress retains exclusive control over whether the Commission receives appropriations.  638 F.2d at 604.

As to spending power, the Commission is bound by the terms of the Commission Act, and the Commission's finances are controlled by the administrative secretariat—the nonprofit organization hired by the Secretary of Interior.  Commission Act § 9(b).  The Commission must also answer to the federal government on its activities, including preparing a report for the President, *id.* § 5(c), and sending annual reports with an

---

[19] *See* Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, 138 Stat. 25, 283; Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4459, 4819 (2022); Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, 136 Stat. 49, 408; Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1182, 1483 (2020); Further Consolidated Appropriations Act, 2020, Pub. L. No. 116-94, 133 Stat. 2534, 2692 (2019); Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, 133 Stat. 13, 212.

accounting of funds to Congress, *id.* § 9(d). Although the limited nature of this reporting may be more indicative of general oversight, rather than operational control, *see Pearl*, 230 F.2d at 245 (noting that the Civil Air Patrol was merely required to give Congress an annual report, a fact that counseled against federal-agency status), that reporting, when coupled with the direct appropriations and the extent of federal funding, weighs in favor of federal control.

### 4.     *Day-to-Day Operational Control*

The last factor we consider, the extent of federal control over the entity's day-to-day operations, clinches the Commission's character as a federal entity.

Although Congress gave the Commission some latitude in carrying out its agenda, it also provided concrete federal mandates that constrain that discretion. Key guardrails include instructing the Commission to emphasize events in specific "locations of historical significance," Commission Act § 5(b)(2), prescribing the use of a time capsule and other materials, *id.* § 7(f), (g), setting quorum requirements, *id.* § 4(e), and naming a date of termination, *id.* § 10.

Congress even directed the location of meetings, initially mandating that all assemblies be held in Independence Hall in Philadelphia and only later relaxing that requirement. *Id.* § 4(d); Commission Amendments Act § 2(a). In specifying not only what the Commission must do, but also how the Commission must do it, the Commission Act assures Congress's continuing control over how the Commission operates to commemorate the nation's Semiquincentennial. *Cf. Maliandi*, 845 F.3d at 97 (noting that state control over "the

number and location of meetings allowed" indicated that a university was an arm of the state).

That control is also apparent in the Commission's ownership interest (or lack thereof) in its own intellectual property. While in existence, the Commission may acquire and use property and has the "exclusive right" to use and license its intellectual property. Commission Amendments Act § 2(d). Upon its dissolution, however, that property will be used at the direction of the Secretary of the Interior for the National Park Service, or disposed of. Commission Act § 7(g); *cf. Maliandi*, 845 F.3d at 97 (treating the fact that a university "had to turn over ownership of all patents and copyrights to the State" as evidence that it was controlled by the state).

The Commission's terms and conditions of employment, on balance, likewise reflect federal control. On one hand, the Commission Act allows the Chairperson to hire and fire staff without regard to civil-service laws and to set salaries for staff outside of certain federal restrictions. Commission Act § 8(c)(1), 8(c)(3)(A). On the other hand, staff salaries cannot exceed a federal threshold under the United States Code, *id.* § 8(c)(3)(B); an outside "employee of the Federal Government may be detailed to the Commission without reimbursement" while maintaining their civil service protections, *id.* § 8(d); and the Chairperson's procurement of temporary services is subject to federal payment limitations, *id.* § 8(e). And although private-citizen Commissioners are volunteers, they are reimbursed for travel expenses "at rates authorized for an employee of an agency." *Id.* § 8(a)-(b).

These attributes of federal employment cut in favor of the Commission's federal-agency status. So do the Commission's interactions with what the Commission Act

37

tellingly calls "*other* federal agencies." *Id.* § 6(b) (emphasis added) (citation modified). The Commission Act specifies coordination between the Commission and several entities, in particular the Department of the Interior. *Id.* §§ 6, 7(b). For example, the Commission Act requires the Secretary of the Interior to conduct a study on preservation and development of historic sites and battlefields. *Id.* § 6(b)(2). The Secretary must then share that study with the Commission for inclusion in its report to the President about how the nation should commemorate the Semiquincentennial. *Id.* §§ 5(c), 6(b)(2). Likewise, the leaders of the Library of Congress, the Smithsonian, and the National Archives "shall cooperate with the Commission" by helping to develop historical exhibits and collections. *Id.* § 6(b)(3)(B). Officers of these federal entities, too, must submit recommendations to the Commission for inclusion in the report to the President. *Id.* § 6(b)(3)(C). All in all, the level of close coordination and mandated cooperation between the Commission and "other federal agencies" is further evidence of day-to-day control by the federal government. *Id.* § 6(b).

In short, the Commission's day-to-day control—the most weighty of the four factors—also lands on the federal-agency side of the scale.

\*       \*       \*

The upshot of our review is that all four factors reflect the control over the Commission necessary to render it a federal agency: It is congressionally created with a national purpose; it is governed by federal leaders and appointees; it receives significant appropriations and financial oversight from Congress; and its day-to-day operations are either

directed by the Commission Act or controlled, directly or indirectly, by Congress.

The Commission thus qualifies as a federal agency under the FTCA and Westfall Act.

### D. The Defendants Are Employees of the Government

Given that the Commission is a federal agency, we must next determine whether the Defendants qualify as employees of the government under the FTCA and Westfall Act.

As relevant here, Section 2671's broad definition of "[e]mployee of the government" includes (1) "officers or employees of any federal agency" and (2) "persons acting on behalf of a federal agency in an official capacity," either "temporarily or permanently," "with or without compensation." 28 U.S.C. § 2671. Once again, the statute's definition begins with the word "includes," indicating that the list is illustrative, rather than exhaustive. *See Talignani*, 26 F.4th at 382 ("[Section] 2671 does not necessarily contain every instance in which a person is an 'employee of the Government.'").

The existence of "officers or employees" as a standalone category of personnel indicates that "persons acting on behalf of a federal agency" sweeps in a distinct and broader class of persons. Thus, a person may be "an 'employee of the government' under § 2671 even though he [i]s not an 'employee' of a federal agency." *Logue*, 412 U.S. at 530. By way of example, elsewhere in the United States Code, Congress has provided that certain volunteers and those temporarily serving in federal positions qualify as

"employee[s] of the government" for purposes of the FTCA. *See Talignani*, 26 F.4th at 385 (collecting statutes); *Pellegrino*, 937 F.3d at 169, 171 (noting that a state or local law enforcement officers who is deputized into federal service with the Transportation Security Administration is treated as an "[e]mployee of the government" under the FTCA); *Provancial v. United States*, 454 F.2d 72, 75 (8th Cir. 1972) (recognizing that local police officers deputized by the Department of Interior were "employee[s] of the government"). The Supreme Court, too, recognized the possibility that the definition may encompass non-traditional employees, such as "the 'dollar-a-year' man who is in the service of the Government without pay, or an employee of another employer who is placed under direct supervision of a federal agency pursuant to contract or other arrangement." *Logue*, 412 U.S. at 531.

For today's purposes, though, we need not demarcate the outer bounds of an "[e]mployee of the government" under § 2671 or decide whether the Commissioners are best viewed as "employees" or "persons acting on behalf of" the Commission because, either way, the Commissioners fall within the broad category envisioned by Congress. They are federally appointed members of a federal agency who voluntarily serve on the agency's behalf and are subject to oversight and removal by both the agency and their federal appointers. The Defendants are thus "[e]mployee[s] of the government." 28 U.S.C. § 2671.

DiLella and Giordano object that, as private-citizen Commissioners, the Defendants should not qualify because they were "not . . . officer[s] or employee[s] of the Federal Government" at the time of their appointments. Commission Act § 3(2)(A). But whether someone is a private citizen *before*

their appointment says nothing about their status after entering federal service. Once on the Commission, the private-citizen Commissioners meet the FTCA's definition of an "[e]mployee of the government." 28 U.S.C. § 2671.

In sum, the District Court correctly concluded that the Defendants meet the first of the two Westfall Act criteria. The remaining question is whether their allegedly defamatory statements were made within the scope of their employment, or whether the District Court, before concluding they were, should have permitted discovery on that issue.

### E. The Defendants Were Acting Within the Scope of Their Employment

To conclude that substitution was proper, and thus that the Government's sovereign immunity bars DiLella and Giordano's claims, the District Court needed to find that the Defendants acted within the scope of their employment, as applied under principles of state agency law. *See Brumfield v. Sanders*, 232 F.3d 376, 380 (3d Cir. 2000) (noting that, in the Westfall Act context, whether "individual defendants acted within the scope of their employment . . . is a matter of . . . state law").

Here, Pennsylvania law provides that "conduct is within the scope of employment if, but only if: (a) it is the kind [the employee] is employed to perform; (b) it occurs substantially within the authorized time and space limits[; and] (c) it is actuated, at least in part, by a purpose to serve the master." *See CNA v. United States*, 535 F.3d 132, 146 (3d Cir. 2008) (alterations in original) (quoting *Brumfield*, 232 F.3d at 380). As factual findings are sometimes needed to make those assessments, *see id.* at 141, DiLella and Giordano argue that,

even if the Defendants are federal employees, the District Court abused its discretion in determining that they were acting within the scope of their employment without first allowing discovery.

As a general matter, there is no right to discovery in a Westfall Act case. Certification "is *prima facie* evidence" that the alleged tort occurred within the scope of a defendant's employment, and the plaintiff bears the burden to come forward with specific facts to rebut the certification. *Schrob*, 967 F.2d at 935-36. But Westfall certification occurs at the pleading stage, where the plaintiff's contentions about the defendant's conduct are typically confined to the facts alleged in the complaint. So, when there is reason to believe that the Attorney General's certification "is based on a different understanding of the facts than is reflected in the complaint," we have encouraged district courts to "permit[] reasonable discovery." *Melo v. Hafer*, 13 F.3d 736, 747 (3d Cir. 1994). On the other hand, "[p]ermitting additional discovery when the Attorney General's certification is not based on a different understanding of the facts . . . would undermine the intent of the Westfall Act to protect federal employees from responding to state law tort claims." *Brumfield*, 232 F.3d at 380 (quoting *Brumfield v. Sanders*, 50 F. Supp. 2d 381, 385 (W.D. Pa. 1999)).

Here, the Government based its certification on two sources: "[1] the complaint, as well as [2] materials prepared in anticipation of litigation provided by staff of the United States Attorney's Office." J.A. 209. For its part, the complaint—which relies on statements that the Defendants allegedly made in the letter purportedly from Congressman Brady, in a Commission meeting, and in interactions with the

42

press—supports the inference that the Defendants were acting within the scope of their employment. But the Government also relied on "materials prepared in anticipation of litigation," J.A. 209, which theoretically could have given the Attorney General "a different understanding of the facts than is reflected in the complaint," *Melo*, 13 F.3d at 747, when he certified that the Defendants were acting within the scope of their employment. But speculation is not sufficient—a plaintiff still must identify some reason to believe that the Attorney General's understanding of the facts differs from facts in the complaint, and specify what discovery would show that difference. Here, DiLella and Giordano do neither.

At argument, they were unable to articulate any different understanding of the facts that might emerge from the Attorney General's "materials prepared in anticipation of litigation," J.A. 209, to identify what, if any, discovery they would ask for on remand, or to explain how discovery would help defeat certification. Nor is it apparent that discovery would even be permissible, given that the materials appear subject to work-product or attorney-client privilege.

We are left, then, with no indication that certification was based on any "different understanding of the facts" than that supported by the complaint, and we cannot say, in such circumstances, that the District Court abused its discretion in denying jurisdictional discovery. *See Brumfield*, 232 F.3d at 380 (identifying no abuse of discretion in similar circumstances). To the contrary, "permitting additional discovery" in these circumstances "would undermine the intent of the Westfall Act," *id.*, and that result was properly rejected. In the absence of any proffered evidence that certification was based on different facts, or that any discovery would have

revealed a different understanding of the facts, we cannot say that the District Court abused its discretion.

## IV.    <u>Conclusion</u>

For the foregoing reasons, the District Court's judgment will be affirmed.